# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **TOTAL PETROLEUM PUERTO RICO CORP.**, <br><br>  Plaintiff, <br><br> v. <br><br> **ARMANDO CLAUDIO QUINTANA**, *et al.*, <br><br>  Defendants. | Civil No. 16-2979 (GAG/BJM) |

## REPORT AND RECOMMENDATION

Total Petroleum Puerto Rico Corp. ("Total") brought this action under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, against Armando Claudio Quintana, Betty Hernandez Cruz, and their conjugal partnership (collectively "Claudio") after Total terminated Claudio's franchise agreement for the operation of a gas station. Docket No. 1. Alleging that the termination of this agreement and others complied with the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.*, Total moved for preliminary injunctive relief to end the alleged trademark violations and regain possession of certain property. Docket Nos. 2, 26, 95. Claudio opposed. Docket Nos. 18, 92. This matter was referred to me for a report and recommendation,[1] Docket No. 49, and was submitted for adjudication after the parties filed post-hearing briefs based on the parties' stipulated facts and exhibits. Docket No. 109.

For the reasons set forth below, Total's motion should be **GRANTED**.

## BACKGROUND[2]

Total is exclusively authorized and licensed to use "TOTAL"—a trademark registered with the U.S. Patent & Trademark Office—in Puerto Rico. ASF ¶¶ 4, 10, 11. Total owns real property located at 113 Font Martelo Avenue, Humacao (the "property"),

---

[1] Claudio's preliminary injunction motion was also referred to me. Docket Nos. 39, 49. The parties stipulated to the dismissal of that motion, and so the motion is moot. Docket No. 87.

[2] This narrative is drawn from the parties' amended stipulated facts ("ASF"), Docket No. 89, the additional fact the parties stipulated at the May 2017 hearing, Docket No. 91, and the joint exhibits submitted by the parties at this hearing. Docket Nos. 91, 109.

and a Total-branded gas station (the "gas station") is situated on this property. ASF ¶¶ 5, 6, 9. In October 2009, Claudio, who holds an associate's degree, sent Total a business proposal to lease the property for 10 years. ASF ¶¶ 1, 18–20. In this proposal, Claudio relayed that Total's real estate manager had informed him about the property's "operational background," expressed interest in establishing a convenience store on the property, and expressed that he would bear the full costs of remodeling—including, but not limited to, the cost of removing debris and waste from the property, the cost of utilities, and the cost of acquiring permits or anything necessary for the business operation. ASF ¶ 20.

In response to Claudio's business proposal, Total sought new use permits for the operation of a gas station at the property and for the operation of Claudio's proposed business. ASF ¶¶ 21, 101, 102. These permits were necessary because Total had purchased the property in 2008 from a different company. ASF ¶¶ 7, 22. In June 2010, Total proposed an agreement to lease Claudio the property for the operation of a convenience store, and this proposed agreement included an option to purchase the property. ASF ¶ 23. As the parties negotiated this agreement, they also discussed the possibility of Claudio operating the gas station in addition to the property's convenience store and car wash. ASF ¶¶ 23, 24.

***The First Agreement***

In July 2010, Total and Claudio executed a "Lease Agreement with Option to Purchase" (the "First Agreement"). ASF ¶ 25. This agreement ran from August 2010 to July 2012, called for four rent payments, and permitted Claudio to use the property only to establish a supermarket. ASF ¶¶ 26–27, 29. Section 5 of this agreement provided that Claudio accepted the property "as-is, where-is," without warranties or representations; that Total would be responsible for any claim related to environmental claims or obligations, and would release, hold harmless, and defend Claudio from any claim related to environmental damages or duties attributable to Total or to any third party other than Claudio; and that Claudio agreed to release, hold harmless, and defend Total from any claim related to environmental damages or duties attributable to Claudio. ASF ¶ 28.

Under Section 11, Claudio acknowledged that the equipment at the property—including two underground storage tanks—belonged to Total, and, under Section 10, Claudio agreed to bear the cost of permanent improvements, changes, structures, or construction on the property necessary for the operation of the supermarket. ASF ¶¶ 30, 31. Under Section 11, Claudio acknowledged that an "environmental impediment or condition" requiring the closure of the property could occur, Total committed to notifying Claudio if Total needed to close the property due to an issue arising from "any environmental law or regulation," and Total agreed to adjust the rent payment accordingly. ASF ¶ 31. The First Agreement also contained a merger and integration clause. ASF ¶ 32.

*The Second Agreement*

In October 2010, Total and Claudio executed another "Lease Agreement with Option to Purchase" (the "Second Agreement"). ASF ¶ 33. This agreement ran from October 2010 to September 2012, called for four rent payments over the two-year lease term, and permitted Claudio to use the property only to establish a supermarket and run a Total-branded gas station. ASF ¶¶ 33–35. Sections 5, 10, and 11 of the Second Agreement mirrored Sections 5, 10, and 11 of the First Agreement. ASF ¶¶ 28–31, 36–38. Section 16 of the Second Agreement detailed the terms under which Claudio could exercise his option to purchase the property "as-is." ASF ¶ 39. And the Second Agreement also contained two merger and integration clauses—one of which provided that "the present Lease Agreement specifically" replaced, invalidated, and nullified all previous agreements, oral or written, relating to the subject matter addressed in the Second Agreement. ASF ¶¶ 40, 41.

*The Franchise Agreement*

In June 2011, Total and Claudio executed a franchise lease agreement (the "Franchise Agreement") permitting Claudio to operate a supermarket and Total-branded gas station on the property. ASF ¶¶ 42, 55. This agreement ran for two years, called for four payments, and continued on a month-to-month basis after two years. ASF ¶¶ 44, 49, 50. Per the Franchise Agreement and the other agreements contemplated by the Franchise

Agreement—particularly, the Sales and Supply Agreement—the businesses operated on the property cannot be separated without Total's permission, the sale and purchase of gasoline provided the "main consideration" for the agreement, and Total is permitted to terminate "all agreements" in the event of any "breach and/or default." ASF ¶¶ 45–48, 59–64. Under Section 5 of the Franchise Agreement, Claudio certified having inspected the property (which Claudio had possessed since October 2010) and Claudio accepted the property in the "then-current state and condition"—"as-is, where-is." ASF ¶ 51.

Claudio also agreed to waive "all" rights and causes of action for "any hidden vice or defect" on the property, and to bear the cost of any Total-approved construction on the property. ASF ¶¶ 51, 57. Total agreed to become liable for any claim related to environmental claims or obligations, and to release, hold harmless, and defend Claudio from any claim related to environmental damages or duties attributable to Total or any third party. ASF ¶ 51. Claudio agreed that the two underground storage tanks belonged to Total, and that he would comply with applicable state and federal laws relating to these tanks. ASF ¶ 52. And Total permitted Claudio to use the "TOTAL" brand pursuant to the Franchise Agreement. ASF ¶¶ 54, 56. Both the Franchise Agreement and the Sales and Supply Agreement contained merger and integration clauses. ASF ¶¶ 57, 58, 64.

*Purchase Option & Termination*

Claudio initially complied with the prerequisites for exercising his option to purchase the property, but ultimately failed to timely exercise that option. ASF ¶¶ 65–72. This property has been listed in the Puerto Rico Environmental Quality Board's ("EQB") leaking underground storage tank ("LUST") list since 1999. ASF ¶¶ 13, 14. The EQB's file for the property includes a June 2004 environmental report (commissioned by the property's previous owner) and a January 2011 environmental report (commissioned by Total) assessing the existence and nature of contamination at the property. ASF ¶¶ 14–16, 98–100. Total first revealed to Claudio the "actual environmental condition" at the property in September 2011 by delivering the two environmental reports. ASF ¶ 17.

The parties have stipulated that the EQB sent a letter to the property's previous owner stating that this company had failed to submit a corrective action plan for the environmental issue at the property. ASF ¶¶ 92, 93. This company informed the EQB that the corrective action plan would not be submitted because the gas station's underground storage tanks would soon be closed. ASF ¶ 94. Later, this company informed the EQB that the underground storage tanks had been closed. ASF ¶ 95. Though the company never submitted a corrective action plan, a Total representative informed the EQB in 2009 that Total would follow the prior owner's corrective action plan. ASF ¶¶ 96, 97.

In May 2012, Claudio asked the EQB for the gas station's file—which is available to the public. ASF ¶ 73. In June 2012, Total informed Claudio that he had failed to pay rent and requested an immediate payment of the amounts owed. ASF ¶ 74. The following two months, Claudio expressed his continued interest to purchase the property, highlighted the environmental issue at the property, and proposed that Total pay part of the remediation costs so that the parties' business relationship could continue. ASF ¶¶ 75, 76. After various communications between the parties, no agreement materialized. ASF ¶¶ 77–81.

Claudio owes Total over $58,000, and has not paid for gasoline, rent, and other charges due as of July 2016. ASF ¶¶ 82–85. And, to pay the arrears, Claudio agreed to (but later failed to follow) a payment plan. ASF ¶ 83. In July 2016, Claudio stopped purchasing petroleum products from Total and stopped operating the gas station. ASF ¶¶ 83, 88–90. In October 2016, Claudio notified Total that he refuses to pay any of the sums owed because, according to him, the agreements—which were primarily drafted by Total after Claudio had some opportunity to negotiate—are void. ASF ¶¶ 86, 87, 103. The following month, Total terminated Claudio's Franchise Agreement for failure to pay rent and other sums owed, as well as for failure to run the gas station for seven consecutive days. ASF ¶ 91.

## DISCUSSION

Total contends that the Franchise Agreement was terminated in compliance with the PMPA, and that preliminary injunctive relief is warranted to prevent Claudio from

displaying Total's trademark at the gas station and to allow Total to regain possession of the gas station, the property, and the equipment maintained at the property—including the property's two underground storage tanks. Claudio concedes that Total should be allowed "to remove any trademarks from the" property, but contends that Total is not entitled to any other injunctive relief because the parties' agreements are void. Docket No. 92 at 7.

To obtain preliminary injunctive relief, a plaintiff must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter* v. *Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Claudio conceded that injunctive relief is warranted for Total's Lanham Act claims, and so the court need only evaluate whether Total validly terminated the parties' agreements.

**I.      Likelihood of Success**

Total contends that Claudio's Franchise Agreement was validly terminated for failure to pay over $50,000 and failure to operate the gas station for over seven days. The "PMPA is a conventional dealer-protection statute limiting the circumstances in which a motor fuel franchisor can terminate or choose not to renew a franchise relationship." *Santiago-Sepulveda* v. *Esso Standard Oil Co. (P.R.)*, 643 F.3d 1, 4 (1st Cir. 2011). The PMPA permits a franchisor to "terminate the relationship on any of five specified grounds." *Id.*; 15 U.S.C. §§ (b)(2)(A)–(E). One such ground "include[s] '[t]he occurrence of an event which is . . . relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable.'" *The Shell Co. (P.R.)* v. *Los Frailes Serv. Station, Inc.*, 605 F.3d 10, 20 (1st Cir. 2010) (citing 15 U.S.C. § 2802(b)(2)(C)). Two such events include the franchisee's failure "to pay the franchisor in a timely manner," 15 U.S.C. § 2802(c)(8), and failure "to operate the marketing premises for . . . 7 consecutive days." *Id.* § 2802(c)(9)(A).

When a franchisor terminates the franchise relationship, "the burden falls on the franchisor to establish 'that [the] termination or nonrenewal was permitted' by" the PMPA. *See Santiago-Sepulveda*, 643 F.3d at 5 (citing 15 U.S.C. § 2805(c)). To meet this burden,

the franchisor must, as a general matter, provide "90 days' notice of termination." *Equilon Enterprises, L.L.C.* v. *Rahim, Inc.*, 80 F. App'x 463, 468 (6th Cir. 2003). But there is an exception to this general requirement: "[i]n circumstances in which it would not be reasonable for the franchisor to furnish [90 days'] notification . . . such franchisor shall furnish notification to the franchisee affected thereby on the earliest date [that is] reasonably practicable . . . ." *Id.* (quoting 15 U.S.C. § 2804(b)(1)(A)). This statutory provision "has been interpreted to allow franchisors significant latitude when a franchisee has been delinquent in making payments to the franchisor." *Id.* Accordingly, less than 90 days' notice may be provided in cases where the franchisee has been delinquent in making payments "because 'requiring [the franchisor] to continue to provide product to [the franchisee] for an additional ninety days would expose [the franchisor] to potential[ly] large additional deficiencies for the remainder of the ninety day termination period.'" *Equilon Enterprises*, 80 F. App'x at 468 (notice that franchise agreement would be terminated "effective immediately" permissible where franchisee had failed to pay amounts owed) (quoting *Loomis* v. *Gulf Oil Corp.*, 567 F. Supp. 591, 597 (M.D. Fla. 1983) (90 days' notice not required where franchisee had already failed to pay over $56,000)).

Here, Total notified Claudio about the "immediate termination" of the Franchise Agreement in November 2016. ASF ¶ 91; J. Ex. 17. Total explained that this termination was due to Claudio's failure to pay amounts owed—over $58,000—and for failure to operate the gas station for over seven days. Because each of these grounds provide ample basis to terminate a franchise relationship governed by the PMPA, Total had adequate cause to terminate the Total-Claudio franchise relationship. *See* 15 U.S.C. §§ 2802 (b)(2)(C), (c)(8)–(9). And, as in *Loomis* and *Equilon Enterprises*, Total could validly end the franchise relationship on less than 90 days' notice because Claudio already owed over $58,000.

Notwithstanding the above, Claudio suggests Total is unlikely to succeed on the merits because the Franchise Agreement is void pursuant to the doctrine of "dolo." The Franchise Agreement is "largely governed by Puerto Rico law." *See Santiago-Sepulveda*,

643 F.3d at 8. "Dolus or dolo is a form of contractual deceit that can serve to invalidate consent to an otherwise valid contract or compromise." *Citibank Glob. Markets, Inc.* v. *Rodriguez Santana*, 573 F.3d 17, 29 (1st Cir. 2009). Dolo, also known as "fraud by concealment," "does not require proof of detrimental reliance on false representations." *Prado Alvarez* v. *R.J. Reynolds Tobacco Co.*, 405 F.3d 36, 44 (1st Cir. 2005). The "Puerto Rico Supreme Court has made clear that good faith on the part of contracting parties is 'always presumed,' and one seeking to rely on dolo to invalidate a contract must rebut the presumption of good faith with evidence of intentional fault or bad faith." *Citibank*, 573 F.3d at 29. And, "in determining whether to permit invalidation of a contract on the basis of dolo, Puerto Rico courts place considerable weight on the education, social background, economic status, and business experience of the party seeking to avoid the contract." *Id.*

In this case, the court should find that Claudio proffered insufficient evidence of dolo. As an initial matter, the parties' stipulated facts shed little light on the factors Puerto Rico courts consider when assessing a claim of dolo. *See id.* Because Claudio had the burden of establishing dolo, this evidentiary gap weighs against his position. *See id.* The stipulated facts do reveal, however, that Claudio attended college and earned an associate's degree over 20 years ago. ASF ¶ 1. And the record also reveals that Claudio was somewhat sophisticated in business matters. ASF ¶¶ 18–20. After all, Claudio initiated the business relationship between the parties by presenting a business proposal to Total for a 10-year commercial property lease. Additionally, some of the Franchise Agreement's terms were subject to negotiation, ASF ¶ 103, and several communications between Total and Claudio show Claudio attempting to negotiate a favorable business deal with Total even after the parties' business relationship began to sour. *See* ASF ¶¶ 77–81. The First Circuit has rejected a dolo claim with individuals appearing to have less sophistication than Claudio, and so the court should, for greater reason, reject any claimed dolo here. *See Citibank*, 573 F.3d at 29 ("Applying" the "factors" for assessing dolo, the First Circuit has "declined to invalidate English-language releases signed by individuals, two of whom lacked fluency

in English, and all of whom were educated at slightly beyond the high school level") (citing *Caban Hernandez* v. *Philip Morris USA, Inc.*, 486 F.3d 1, 9 (1st Cir. 2007)).

What is more, Claudio has proffered insufficient evidence rebutting the presumption of good faith. While Claudio claims that the environmental issue at the property rendered the Franchise Agreement void, it is uncontested that the property has been on the EQB's LUST list since 1999 and that an environmental report for the property was commissioned as early as 2004. While the parties agree that no governmental agency ever informed Claudio about the property's condition, ASF ¶¶ 104–105, the EQB contained a *public* file for the property disclosing the property's environmental issue. Indeed, the record indicates that Claudio requested and received these documents in May 2012, ASF ¶ 73, and Claudio proffered insufficient evidence to suggest that Total concealed these documents or otherwise intentionally concealed the condition of the property. To the contrary, the agreements between the parties, which apparently arose from arms-length transactions permitting some negotiation, contemplated potential environmental issues at the property and placed on Claudio the burden of paying any construction or improvement costs. ASF ¶¶ 28–31, 36–38, 51–52, 57, 103. And—importantly—Claudio specifically certified under Section 5 of the Franchise Agreement that he had inspected the property and accepted it "as-is, where-is," without warranties or representations. ASF ¶ 51.

Claudio's failure to proffer sufficient evidence of Total's "intentional fault" or "bad faith"—coupled with Claudio's education and modest sophistication in business matters––should lead this court to reject Claudio's dolo claim at this juncture. *See Citibank*, 573 F.3d at 29 ("Fernandez's sophistication, coupled with his failure to allege sufficient, colorable bad faith on the part of Smith Barney, defeats any claimed dolo in this case"); *see also Fournier* v. *E. Airlines, Inc.*, 655 F. Supp. 1037, 1039 (D.P.R. 1987) (court rejected dolo claim where high-ecological value of property prevented it from being used for residential development where the parties' contract specifically disclaimed "warranties as to the use of the land for a specific purpose" and the "contract itself provide[d]

contingencies for its resolution" in the event the property could not be used as intended). Thus, because Total is likely to succeed in showing that Claudio's Franchise Agreement was validly terminated under the PMPA, and because Claudio likely cannot (based on the current record) show dolo, the court should find that Total is likely to succeed on the merits.

## II.     Irreparable Harm, Balance of Hardships, & Public Interest

To establish irreparable harm, "a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business." *Ross-Simons of Warwick, Inc.* v. *Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). Rather, "irreparable harm is a natural sequel" when the plaintiff shows that his "legal remedies are inadequate," or that he will suffer a "substantial injury that is not accurately measurable or adequately compensable by money damages." *Id.* When a case involves "real property," the First Circuit has "often found the irreparability of the injury to be of paramount concern." *Narragansett Indian Tribe* v. *Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991) (citing *K–Mart Corp.* v. *Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989)). Yet, even in cases involving real property, the plaintiff still must show that irreparable harm is *likely* to occur in the absence of an injunction. *See id.*

In this case, Total contends that it has lost control over its real property, the gas station, and the equipment maintained at the property—including the two underground storage tanks. Because this loss of control has prevented Total from exploiting the commercial benefits of its property, and because these damages are likely difficult to ascertain, Total is likely to suffer irreparable harm. *See RoDa Drilling Co.* v. *Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (irreparable harm shown where "properties [were] income producing, and realizing their income potential depend[ed] upon active management of the properties"—something plaintiff could not do without injunctive relief). Additionally, Total underscores that the agreements and applicable law expose Total to liability in the event of an environmental claim—an exposure that may very well materialize because of the leaking underground storage tanks on the property, which are owned by Total. This, too, constitutes likely irreparable harm. *See PC P.R. LLC* v. *El Smaili*, 925 F. Supp. 2d 222, 232

(D.P.R. 2013) ("The damages that" a fuel spill from an underground storage tank "can cause are irreparable, with the brunt of the responsibility being borne by" the owner of the underground storage tank, and this liability remains even if the owner cannot "access the station premises"). Thus, the court should find that Total is likely to suffer irreparable harm.

Under the third factor, the court must balance "the hardship that will befall the nonmovant if the injunction issues . . . with the hardship that will befall the movant if the injunction does not issue." *Mercado-Salinas* v. *Bart Enterprises Intern., Ltd.*, 671 F.3d 12, 19 (1st Cir. 2011). Without an injunction, Total will be deprived of access to its property, the ability to use the property for the sale of gas, and the benefit of its contracts with Claudio. Total also risks continued exposure to an environmental claim. *See El Smaili*, 925 F. Supp. 2d at 232. If an injunction issues, on the other hand, Claudio will not be able to operate the property or gas station. But this circumstance is ameliorated somewhat because Claudio failed to operate the gas station for months in any event. ASF ¶ 90. And, because the injunctive relief that should be issued ultimately flows from Claudio's failure to pay amounts owed and failure to operate the gas station, this court should find that the balance of hardships tips in Total's favor.

The final factor, the public interest, also weighs in favor of granting the injunction. "The public interest that is referred to in the test for a preliminary injunction means the public's interest in the issuance of *the injunction itself*." *Braintree Labs., Inc.* v. *Citigroup Glob. Markets Inc.*, 622 F.3d 36, 45 n.8 (1st Cir. 2010). As an initial matter, issuing the injunction would permit Total to exercise its property rights, and "Puerto Rico has a strong public interest in preserving the rights of its citizens against the misappropriation and misuse of their property." *Am. Health, Inc.* v. *Chevere*, No. CIV 12-1678 PG, 2013 WL 5297295, at *7 (D.P.R. Sept. 19, 2013). Second, issuing "the preliminary injunction would hold" Claudio "to the terms of the bargain" he "entered into through the franchise agreement," and "[e]nforcement of contractual duties is in the public interest." *See Certified Restoration Dry Cleaning Network, L.L.C.* v. *Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007); *see also* P.R. Laws Ann. tit. 31, § 3471 ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."). Third, the injunction

would serve the public interest by allowing Total to access (and potentially remediate) the property, the gas station, and the leaking underground storage tanks—as opposed to having the gas station sit idly in Claudio's hands while the environmental issue remains unresolved. *See El Smaili*, 925 F. Supp. 2d at 232; *see also Chevron P.R., LLC* v. *Perez-Rosado*, 673 F. Supp. 2d 69, 75 (D.P.R. 2009) ("the environmental risks from unmonitored petroleum storage tanks . . . negatively affect the public interest"). Thus, because all four of the equitable factors for injunctive relief weigh in Total's favor, the court should grant preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, preliminary injunctive relief should be **GRANTED**. The court should order Armando Claudio Quintana, Betty Hernandez Cruz, and their conjugal partnership to (1) surrender the property located at 113 Font Martelo Avenue, Humacao, the gas station at that property, and the equipment—including the two underground storage tanks—at the property; (2) comply with all other post-termination covenants of the Franchise Agreement; and (3) cease the use or display of the "TOTAL" trademark.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas* v. *Arn*, 474 U.S. 140, 155 (1985); *Davet* v. *Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co.* v. *Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden* v. *Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**
In San Juan, Puerto Rico, this 12th day of July 2017.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge